**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                Case No. 16-40047-01-DDC

KENT E. LINDEMUTH,

     Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on four motions filed by defendant Kent Lindemuth:
(1) Motion to Change Location of Trial (Doc. 44); (2) Motion to Sever Counts 114 and 115
(Doc. 46); (3) Motion to Dismiss Counts 1–103, 104, and 111 (Doc. 47); and (4) Motion to
Dismiss Counts 1–103 (Doc. 48). The court considers and rules on each of these motions,
separately, below.

## Background

Mr. Lindemuth is a real estate developer in Topeka, Kansas, whose business dealings
made him a visible member of the community. But things took a rough turn for Mr. Lindemuth.
On November 9, 2012, Mr. Lindemuth filed six petitions for Chapter 11 bankruptcy in the
United States Bankruptcy Court for the District of Kansas ("Bankruptcy Court") and became a
debtor-in-possession. During his bankruptcies, Mr. Lindemuth disclosed that he had total debts
of more than $3.5 million. Eventually, the Bankruptcy Court approved Mr. Lindemuth's Chapter
11 plan. The Bankruptcy Court issued the required final decrees and closed Mr. Lindemuth's
bankruptcy cases on December 29, 2015.

Sometime later, federal authorities charged Mr. Lindemuth with failing to disclose the purchase of 103 firearms during his bankruptcy proceedings. According to the government's charges, these firearms were worth more than $80,000. The government secured an indictment against Mr. Lindemuth on June 1, 2016, charging him with 103 counts of bankruptcy fraud by concealment and aiding and abetting bankruptcy fraud by concealment. Doc. 1. On December 14, 2016, the government secured a Sealed First Superseding Indictment charging that Mr. Lindemuth also had failed to disclose the existence of two bank accounts and two vehicles. Doc. 32. For simplicity, this Order refers to that First Superseding Indictment as "the Indictment."

The Indictment charges Mr. Lindemuth with 117 crimes in 115 separate counts. In counts 1 through 103, the Indictment charges Mr. Lindemuth with 103 separate counts of bankruptcy fraud by concealment under 18 U.S.C. § 152(1) and aiding and abetting bankruptcy fraud by concealment under 18 U.S.C. § 2. The Indictment bases these 103 counts on 103 alleged purchases of firearms that Mr. Lindemuth allegedly did not disclose during his bankruptcy proceedings. Counts 104 and 111 also charge Mr. Lindemuth with bankruptcy fraud by concealment and aiding and abetting bankruptcy fraud by concealment. These two counts are based on allegations that Mr. Lindemuth failed to disclose the existence of two bank accounts. Count 104 charges that Mr. Lindemuth failed to disclose the existence of a bank account at Envista Credit Union and failed to disclose that he had deposited more than $250,000 into that account during his bankruptcies. Count 111 charges that Mr. Lindemuth failed to disclose the existence of a bank account at US Bank and failed to disclose that he had deposited more than $1.5 million into that account during his bankruptcies. Counts 105 through 110 charge Mr. Lindemuth with five separate counts of money laundering under 18 U.S.C. § 1957. These five counts charge that Mr. Lindemuth made deposits and withdrawals to or from the undisclosed

Envista Credit Union account. Counts 112 and 113 also charge Mr. Lindemuth with bankruptcy fraud by concealment and aiding and abetting bankruptcy fraud by concealment. The Indictment bases these two counts on Mr. Lindemuth's alleged failure to disclose that he owned a 2009 Ford Mustang worth $90,000 and a 2008 Ford GT 500 Mustang worth $150,000 during his bankruptcies. Counts 114 and 115 charge Mr. Lindemuth with receiving ammunition and firearms while under indictment in this case.

Between February 17, 2017 and February 20, 2017, Mr. Lindemuth filed a motion to change the venue of his trial (Doc. 44), a motion to unseal part of the grand jury transcript (Doc. 45), a motion to sever counts 114 and 115 from the other 113 counts of the Indictment (Doc. 46), and four different motions to dismiss (Docs. 47, 48, 49, 50). At a hearing on April 3, 2017, the court granted Mr. Lindemuth's motion to unseal part of the grand jury transcript (Doc. 45) and denied two of his motions to dismiss (Docs. 49, 50). Doc. 53. The court took the other four motions under advisement.

On April 5, 2017, the government secured the Second Superseding Indictment, which modifies the dates associated with the charges in counts 1 through 103. Doc. 56. It also adds a charge of perjury to the 115 other counts from the Indictment. *Id.* Then, on May 3, 2017, the government secured the Third Superseding Indictment, which charges Mr. Lindemuth with a third count of receiving firearms while under indictment. Doc. 71. The court has set Mr. Lindemuth's trial for September 12, 2017, in the Topeka, Kansas, federal courthouse.

Although the government secured two superseding indictments after Mr. Lindemuth filed the pending motions, the court rules those motions based on the charges in the Indictment because Mr. Lindemuth's motions target that document. The court believes that its rulings will inform the parties, narrow the issues, and guide the future course of this case.

<u>**Analysis**</u>

**I.      Motion to Change Location of Trial**

In his first motion, Mr. Lindemuth asks the court to move his trial from the Topeka, Kansas, federal courthouse to the Kansas City, Kansas, federal courthouse.  Although Mr. Lindemuth seeks an intra-district transfer, the court relies on Federal Rule of Criminal Procedure 21 (which governs inter-district transfers) for guidance.  *United States v. Walker*, 890 F. Supp. 954, 958 n.5 (D. Kan. 1995).  Mr. Lindemuth relies on two subsections of Rule 21:  Rule 21(a) and Rule 21(b).  The court begins its discussion with his Rule 21(a) arguments.

**A.      Transfer Under Rule 21(a)**

Under Rule 21(a), the court must transfer a case to another venue "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."  This rule applies when "prejudice in the community will make it difficult or impossible to select a fair and impartial jury."  *Id.* at 958 (citations omitted).  Whether to grant a change of venue motion, however, is discretionary.  *Id.*  Therefore, "[t]he facts must compel and not merely support venue transfer before an abuse of discretion will be found by an appellate court."  *Id.* (quoting *United States v. Hunter*, 672 F.2d 815, 816 (10th Cir. 1982), *abrogated on other grounds by United States v. Call*, 129 F.3d 1402 (10th Cir. 1997); further citations omitted).

Here, Mr. Lindemuth asks for a change of venue, arguing that the Topeka-based, pre-trial media coverage of this case, his previous bankruptcies, and him in general likely will prevent him from "obtain[ing] the unbiased jury that is essential to a fair trial" in Topeka.  Doc. 44 at 1–

2. So, Mr. Lindemuth asserts that holding the trial in Topeka will violate his due process rights, and thus asserts that the court must transfer the trial as a matter of law.

Pre-trial publicity can give rise to a due process violation—and thereby require a transfer—in two ways: "(1) where prejudice is presumed because the publicity was 'sufficiently prejudicial and inflammatory and [it] . . . saturated the community where the trial was held,' or [(2)] where the defendant establishes actual prejudice resulting from the publicity." *Walker*, 890 F. Supp. at 959 (citations omitted). Presumed prejudice may appear before jury selection, but actual prejudice cannot appear until jury selection, at the earliest. *See House v. Hatch*, 527 F.3d 1010, 1023–24 (10th Cir. 2008) (explaining the difference between presumed and actual prejudice, stating that "[a]ctual prejudice 'manifest[s] at jury selection' when voir dire reveals 'the effect of pretrial publicity . . . is so substantial as to taint the entire jury pool.'" (citation omitted)). Here, then, Mr. Lindemuth asserts that presumed prejudice exists.

As the party requesting transfer, Mr. Lindemuth "bears the burden of establishing the presumption of prejudice." *Walker*, 890 F. Supp. at 959 (citations omitted). This is not an easy burden to bear. As the Supreme Court noted a few years ago, "[a] presumption of prejudice . . . attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 381 (2010). Indeed, "prejudice will only be presumed where publicity 'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial.'" *Gardner v. Galetka*, 568 F.3d 862, 888 (10th Cir. 2009) (quoting *Goss v. Nelson*, 439 F.3d 621, 628 (10th Cir. 2006)). "Pre-trial publicity in topical criminal cases is inevitable,"[1] and "[a] criminal defendant is not constitutionally entitled to a trial by jurors ignorant about relevant issues and

---

[1] *United States v. Abello-Silva*, 948 F.2d 1168, 1176 (10th Cir. 1991).

events."[2]  "Simply showing that all the jurors knew about the case and that there was extensive pretrial publicity will not suffice . . . ."  *Id.* (quoting *Hale v. Gibson*, 227 F.3d 1298, 1332 (10th Cir. 2000)).  So, pre-trial publicity affects a defendant's constitutional rights "only when it dictates the community's opinion as to guilt or innocence."  *Walker*, 890 F. Supp. at 958 (quoting *Abello-Silva*, 948 F.2d at 1176).  Thus, Mr. Lindemuth must establish that "an irrepressibly hostile attitude pervaded the community" to prove presumptive prejudice from pre-trial publicity.  *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994) (quoting *Abello-Silva*, 948 F.2d at 1176).

The content of the complained-of publicity is critical to determining whether to transfer a trial.  *See Coleman v. Kemp*, 778 F.2d 1487, 1491 (11th Cir. 1985) ("Because the presumed prejudice claim requires an extensive evidentiary showing to warrant relief . . . an extensive discussion of the pretrial publicity is in order."), *reh'g denied sub nom.*, *Isaacs v. Kemp*, 782 F.2d 896 (11th Cir. 1986).  The court thus directs its analysis to the pre-trial media coverage that Mr. Lindemuth submitted to support his motion.

### 1.    *Pre-Trial Publicity of This Case*

Mr. Lindemuth submitted 46 unique articles and more than nine pages of reader comments to support his motion for transfer.  Doc. 44-1; Doc. 52-1.  Of the 46 articles provided, only 11 mention this case.  Doc. 44-1 at 104–18, 120–24, 131–36.[3]  These 11 articles do not comment on the case, however, they simply recite facts.  For instance, several of the articles report the crimes Mr. Lindemuth is charged with and explain what those crimes accuse him of doing—*e.g.*, how a person could commit bankruptcy fraud by concealment.  *Id.* at 104.  Others

---

[2] *Walker*, 890 F. Supp. at 958 (quoting *United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11th Cir. 1992)); *see also Murphy v. Florida*, 421 U.S. 794, 799–800 (1975) ("Qualified jurors need not, however, be totally ignorant of the facts and issues involved.").

[3] Of these 11 articles, five are from the *Topeka Capital Journal*, four are from WIBW online, and two are from KPR.  The six articles from WIBW and KPR are nearly identical to several of the *Topeka Capital Journal* articles.

report that Mr. Lindemuth pleaded not guilty to the charges and asked the court to designate this case as a complex one and what that designation means. *Id.* at 106. Two of the articles, however, warrant individualized discussion.

On July 20, 2016, the *Topeka Capital Journal* published an article titled "Real Estate Developer Kent Lindemuth Has Hand in Signs Opposing D.A. Candidate Mike Kagay." This article reported that Mr. Lindemuth actively opposed Mr. Kagay's bid for Shawnee County, Kansas District Attorney. *Id.* at 108. The article mentioned Mr. Lindemuth's disappointment that "low-level crimes aren't being prosecuted under [the] current District Attorney Chad Taylor," and reported that Mr. Kagay was prosecuting Mr. Lindemuth in state court for two counts of criminal threat. *Id.* The article also briefly referenced the charges against Mr. Lindemuth in this case. *Id.* at 109.

On January 24, 2017, the Topeka Capital Journal published an article titled "New Charges: Kent Lindemuth Concealed $1.75 Million from Bankruptcy Court." This article reported that Mr. Lindemuth had been arrested and incarcerated for nine days after the government filed the Indictment in this case. *Id.* at 112–15. The article also reports that Mr. Lindemuth "stipulated to allegations of violating [conditions of] his [pre-trial] release," but Judge Sebelius declined to revoke Mr. Lindemuth's release. *Id.* at 114. The article did not mention what allegations Mr. Lindemuth stipulated to committing. The article did report, however, that Mr. Lindemuth's pre-trial release included an electronic anklet monitor and that Judge Sebelius added the following terms to his release: he cannot "buy or acquire firearms, ammunition, knives or 'destructive devices' directly or through third parties; [cannot] attend shows or auctions where weapons were sold; and [cannot] travel outside Shawnee County except

to meet with his Lawrence-based attorneys." *Id.* at 114–15.  The article also referenced the two

criminal threat charges mentioned above.  It reported,

> Lindemuth was convicted in Shawnee County District Court of making a criminal
> threat—a felony—on Sept. 28 . . . .
>
> In that case, a jury convicted Lindemuth of threatening an Oklahoma trucking
> company owner but acquitted him of a second count of the same charge.
>
> When testifying, Lindemuth denied threatening to kill or shoot the trucking firm
> owner during a dispute over a trailer and cargo valued at more than $500,000 in
> October 2014.

*Id.* at 115.  Again, this article did not comment on any of the charges against Mr. Lindemuth in

this case; it simply reported the facts based on available public records and pre-trial hearings.

Of the 35 articles that do not mention this case, 16 are about Mr. Lindemuth's

bankruptcies and bankruptcy-related auctions of his properties, five are about what happened to

his properties that others purchased at auction, three are about Topeka's tax woes and mention

Mr. Lindemuth as owing taxes or other money to the city, five are about Mr. Lindemuth's

businesses or history in general, three are about other criminal or questionable activities by Mr.

Lindemuth, and three have nothing to do with Mr. Lindemuth.  *Id.* at 1–103, 119, 125–30.  Five

of these 35 articles warrant individualized, though brief, attention.

In January 2014, the *Topeka Capital Journal* ran a series of articles profiling Mr.

Lindemuth's rise as a Topeka real estate developer.  *Id.* at 12–19.  In one of these articles, the

newspaper reported that Mr. Lindemuth started his career as a developer after he was fired from

a job at Goodyear—reportedly—for stealing, sued Goodyear, and confidentially settled the case.

*Id.* at 13.  In another article, the newspaper recites a story about Mr. Lindemuth's dispute with a

tenant.  The dispute found its way to the courts, but before coming to a final resolution, Mr.

Lindemuth drove his truck into the tenant's storefront.  The article quotes Mr. Lindemuth as

saying "[b]y the way the truck is for sale . . . [t]hey say Fords are tough, but GMCs are tough, too," during a court hearing after the incident. *Id.* at 18. The other profile articles simply recite facts about Mr. Lindemuth's property holdings and business dealings in the Topeka area and do not contain any commentary or information that the court views as prejudicial or relevant to this case.

On July 8, 2014, the *Topeka Capital Journal* published an article titled "Lindemuth to Burglar: Next Shot Won't be a Warning." This article reported that Mr. Lindemuth had fired warning shots in the direction of a would-be thief who had broken into one of his properties around 1 a.m. that morning. *Id.* at 43–44. The article quotes Mr. Lindemuth as saying, "One suspect wouldn't keep his hands up and indicated he had something in his pocket, and then he took off running, and I fired some warning shots and told him the next one wouldn't be a warning." *Id.* at 44. The article goes on to report that both suspects had been taken to the law enforcement center for questioning and that Mr. Lindemuth had gone to the center also, but only to give a statement. The article does not report whether Mr. Lindemuth was arrested or questioned as part of a criminal investigation because of the shooting. The record contains no other articles or information about this shooting or its consequences for Mr. Lindemuth.

Three months later, the *Topeka Capital Journal* published an article titled "Lindemuth Shoots Intruder Early Friday at Vacant Property." This article reported that Mr. Lindemuth had shot and grievously wounded another would-be thief. *Id.* at 49. The article explained that the intruder was taken to the hospital with serious injuries and that law enforcement officers had taken Mr. Lindemuth in for questioning. *Id.* The article does not say whether Mr. Lindemuth was arrested or charged with a crime. The record contains no other articles or information about this shooting or its consequences for Mr. Lindemuth.

The *Topeka Capital Journal* published the last article the court will discuss on May 8, 2015. *Id.* at 90. The article, titled "Developer Kent Lindemuth Arrested in Manhattan for Shawnee County Warrant," was short. *Id.* It reported only that Mr. Lindemuth had been arrested in Manhattan, Kansas, and that the "warrant was in connection with criminal deprivation of property." *Id.* A later article explained that the charges were dismissed for lack of probable cause. *Id.* at 110.

Mr. Lindemuth also submitted a compilation of reader comments attending the online edition of many of the articles discussed above. Many—if not all—of the comments express negative opinions about Mr. Lindemuth. The comments range from suggesting that Mr. Lindemuth murdered his business partner to more benign topics—such as asking how many times Mr. Lindemuth would be allowed "to violate the terms of his probation before incarcerating him until his trial." *Id.* at 117. Of the more benign comments, most express displeasure with the justice system, not Mr. Lindemuth. *E.g.*, Doc. 52-1 at 1 ("lol, he will be dead before anything happens. the wheels of justice grind slowly."). The court does not need to recite all the comments here. It is sufficient to say that the comments in the record show considerable disapprobation of Mr. Lindemuth's alleged conduct as a property owner and businessman, and many question his moral character.

2. *Analysis of Whether the Pre-Trial Publicity Requires a Transfer*

Mr. Lindemuth contends that media coverage of him, his bankruptcies, and this case, combined with readers' online comments about that coverage, show that "many Topeka residents have developed extremely negative opinions concerning him, and his business operations," making it "likely" that he will "be unable to obtain the unbiased jury that is essential to a fair trial." Doc. 44 at 1.

As the Tenth Circuit has explained, for a "reviewing court to reach a presumption that inflammatory pretrial publicity so permeated the community as to render impossible the seating of an impartial jury, the court must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." *Goss*, 439 F.3d at 630 (quoting *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998), *disapproved of on other grounds by Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999)). There are no set factors for the court to consider when deciding whether a defendant has established presumed prejudice, but a few general principles exist. For instance, when the news coverage of the case consists mostly of "statements of fact gathered from public records and from pre-trial hearings," presumptive prejudice is unlikely. *Abello-Silva*, 948 F.2d at 1177; *see also Stafford*, 34 F.3d at 1566 (holding that no presumptive prejudice existed when "nothing in the record . . . suggest[ed] that [the] publicity was anything other than factual reporting"). And, generally, "highly editorialized articles are more inflammatory than mere accounts of the factual developments in a case." *United States v. Wittig*, No. 03-40142-JAR, 2005 WL 758605, at *4 (D. Kan. Apr. 4, 2005) (first citing *United States v. Higgs*, 353 F.3d 281, 308 (4th Cir. 2003); then citing *Mills v. Singletary*, 63 F.3d 999, 1010–12 (11th Cir. 1995); then citing *Andrews v. Shulsen*, 600 F. Supp. 408, 417 (D. Utah 1984), *aff'd*, 802 F.2d 1256 (10th Cir. 1986)).[4] Also, it is well-settled that "unfavorable publicity does not of itself raise a presumption of prejudice," *United States v. Jackson*, 482 F.2d 1167, 1177 (10th Cir. 1973) (citations omitted), and that publicity that is not inherently prejudicial or unforgettable, even if extensive, "is no reason to conclude prior to voir dire that

---

[4] *See also Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (suggesting that media coverage containing opinions about a defendant's guilt and the appropriate punishment were more prejudicial than other types of coverage); *Daniels v. Woodford*, 428 F.3d 1181, 1212 (9th Cir. 2005) (finding venue change necessary in part because "[t]he press accounts did not merely relate factual details, but included editorials and letters to the editor calling for [the defendant's] execution"); *United States v. De La Vega*, 913 F.2d 861, 864–65 (11th Cir. 1990) (holding that the district court's denial of the defendants' change of venue motion did not violate due process in part because the news accounts, though "occasionally punctuated by editorial remarks," were "largely dispassionate" and "largely factual").

objectivity [is] impossible," *United States v. Hueftle*, 687 F.2d 1305, 1310 (10th Cir. 1982) (citations omitted). Moreover, a long space of time between peak publicity and the trial can diminish the effect of potentially prejudicial pre-trial publicity. *Patton v. Yount*, 467 U.S. 1025, 1035 & n.11 (1984); *Wittig*, 2005 WL 758605, at *4. With this general guidance in mind, the court turns to consider whether the pre-trial publicity here warrants a transfer.

Most of the news coverage that plaintiff has submitted occurred one to four years before Mr. Lindemuth was charged in this case, and concerns Mr. Lindemuth's bankruptcies, auctions related to his bankruptcies, how his bankruptcies could affect the Topeka real estate market, and his failure to pay property taxes on several of his properties. The court is not convinced that coverage so totally unrelated to the criminal charges at issue here can support a finding of presumed prejudice; much less coverage that began and ended so long before the criminal charges were filed. Neither party addresses the propriety of relying on such coverage. So, out of an abundance of caution, the court considers the unrelated coverage here.

### a. Unrelated Media Coverage

This coverage does not require a transfer. First, the three *Topeka Capital Journal* articles reporting that Mr. Lindemuth was delinquent on his property taxes merely report information available from the public record. Doc. 44-1 at 9, 57, 67. They do not editorialize—they simply report a list of people and businesses who are behind on their taxes and, at times, discuss those with the largest outstanding balance. Indeed, the articles do not focus on Mr. Lindemuth exclusively. He simply is one of many names mentioned. The court therefore sees nothing prejudicial—inherent or otherwise—in the three tax-related articles. Second, none of the 21 bankruptcy-related articles report information outside the public record. And though a few include quotations from disgruntled Topeka residents, the articles express no opinions about Mr.

Lindemuth or his businesses and do not editorialize. At worst, they manifest frustration and concern about the effect his bankruptcy could have on the Topeka real estate market. But, a later article dispels any concerns about the Topeka real estate market, explaining that Mr. Lindemuth's bankruptcies had had no apparent effect on it. *Id.* at 81. This article even portrays his bankruptcies as a success, with a headline reading "Lindemuth Bankruptcy Plan Approved; Lenders to be Paid." *Id.* at 80. No reason exists to assume that articles about a person's bankruptcy proceedings are inherently prejudicial to his status in a criminal case. The court therefore sees nothing prejudicial in the articles about Mr. Lindemuth's bankruptcies or bankruptcy-related auctions.

Also, all 24 of these articles were published between November 2012 and October 2015.[5] "Given that 'public memory is notoriously short,'" the court concludes that the passage of two years between the peak publicity period of Mr. Lindemuth's bankruptcies and his trial is sufficient time to allay any prejudice those articles could have engendered. *Wittig*, 2005 WL 758605, at *6 (quoting *Lowe v. Kan. City Bd. of Election Comm'rs*, 752 F. Supp. 897, 902 n.8 (W.D. Mo. 1990); then citing *United States v. Pfingst*, 477 F.2d 177, 186 (2d Cir. 1973)). The 24 articles about Mr. Lindemuth's tax problems, bankruptcies, and bankruptcy-related auctions thus do not support his assertion that the community is so stacked against him that he cannot obtain a fair trial in Topeka.

<strong>b.</strong>    <u>Articles About This Case</u>

The 10 articles reporting about this criminal case also do not support Mr. Lindemuth's assertion. Those articles do not editorialize, suggest that Mr. Lindemuth is guilty, or provide information unavailable from pre-trial hearings or the public record. So, based on the general

---

[5] The three articles about property taxes were published on September 21, 2013, October 16, 2014, and December 2, 2014, almost three years before Mr. Lindemuth's trial is scheduled to begin.

principles recited above, these articles do not support Mr. Lindemuth's contention that he cannot receive a fair trial in Topeka.  Because these articles were published closer in time to Mr. Lindemuth's trial date and contain information about this case—unlike the 24 articles just discussed—the court does not wish to rest its decision on general principles alone.  The court thus finds comparison to similar cases a helpful tool.  *See Skilling*, 561 U.S. at 379.  Two cases finding presumptive prejudice are particularly enlightening here:  *Rideau v. Louisiana*, 373 U.S. 727 (1963), and *Sheppard v. Maxwell*, 384 U.S. 350 (1966).

In *Rideau*, law enforcement officers videotaped what appeared to be a staged confession by the defendant—a man accused of bank robbery, kidnapping, and murder.  373 U.S. at 724.  They then aired this videotaped confession on a local television station three separate times.  *Id.*  24,000, 53,000, and 20,000 people viewed each of these broadcasts, respectively, and the Parish where the trial was held had only 150,000 residents.  *Id.*  The Supreme Court held that "it was a denial of due process of law to refuse the [defendant's] request for a change of venue, after the people of [the] Parish had been exposed repeatedly and in depth to the spectacle of [the defendant] personally confessing in detail to crimes with which he was later charged," and explained that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."  *Id.* at 726.

In *Sheppard*, local and national media outlets—including newspaper, television, and radio—reported dozens if not hundreds of sensational stories that ranged from stories explicitly accusing the defendant of murdering his wife to stories citing his infidelity as a possible motive.  384 U.S. at 336–42.  Many of these reports contained patently false information or evidence that was never presented at trial.  *Id.* at 336–42, 356–57.  Still, the Supreme Court was not convinced "that Sheppard was denied due process by the judge's refusal to take precautions against the

influence of pretrial publicity alone." *Id.* at 354. But the inflammatory news coverage extended through trial, where the judge did nothing to separate the jury from the prejudicial coverage. *Id.* at 353–58, 363. In light of these problems, as well as many more not repeated here, the Supreme Court held that the "state trial judge did not fulfill his duty to protect [the defendant] from the inherently prejudicial publicity which saturated the community." *Id.* at 363. It reversed the state trial court's denial of the defendant's habeas petition and ordered him released from prison. *Id.*

The publicity of this case does not even approach that in *Rideau* and *Sheppard*. None of the articles before the court pass judgment on Mr. Lindemuth's guilt, innocence, or prior conduct. None editorialize or insist that he be tried or found guilty. None fabricate facts or detail evidence that the parties may not present at trial. In short, no sensationalism exists. The 10 articles about this case merely recite facts and, as the Supreme Court has explained, facts that the public enjoys the right to know. *See id.* at 349–50 ("The principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo-American distrust for secret trials.' A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field." (citation omitted)). So, the media coverage of this case does not match the fervor or sensationalism that concerned the Supreme Court in *Rideau* or *Sheppard*.

Indeed, Mr. Lindemuth fails to explain how the coverage of this case has so prejudiced the Topeka division's venire that a trial in Topeka would be unfair. The court thus finds that the 10 articles that Mr. Lindemuth submitted in support of his motion that actually discuss this case do not establish presumed prejudice. A few of the articles not yet mentioned do, however, require discussion.

Six of the articles that Mr. Lindemuth submitted in support of his motion mention unsavory or questionable episodes from his past. Courts often view pervasive coverage of a defendant's criminal past—or past questionable conduct—as an important factor to consider when deciding whether pre-trial publicity warrants a venue change. *E.g.*, *Irvin v. Dowd*, 366 U.S. 717, 725–26 (1961) (holding that publicity required a transfer and noting that articles leading up to the trial included "reference[s] to crimes [the defendant] committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war" and "accused [the defendant] of being a parole violator"). In *United States v. Abrahams*, for instance, the Massachusetts federal court held that a change of venue was necessary in part because of news stories detailing the defendant's prior crimes or questionable activities. 453 F. Supp. 749, 753–54 (D. Mass. 1978). There, the defendant was charged with "knowingly and willfully making unsworn false statements of material facts in a matter within the jurisdiction" of the District of Massachusetts. *Id.* at 751. Specifically, the defendant was accused of lying about his name, the fact that he had never used another name, his birthdate and place, and "that he had never been arrested or convicted of a crime." *Id.* In other words, the defendant was accused of being a con man. The pre-trial news stories described, and "usually as if they were indisputable facts," the following things about the defendant:

> (1) his use of half a dozen aliases; (2) the startling discovery of his true identity; (3) his characterization by the FBI as an "armed and dangerous" fugitive; (4) his convictions for income tax fraud, defrauding another commodities dealer, and writing a $3,000 bad check; (5) the charges against him, pending in two other federal courts, three state courts, and Canada, for contempt, prison escape, passport fraud, obtaining money under false pretenses, issuing worthless checks, probation violation for bond default, contributing to the delinquency of a minor, and writing numerous bad checks for large amounts; (6) his failure to appear for various court proceedings; (7) the consequent denial of bail; (8) the fraudulent deceptive, manipulative, and boiler-room practices of his commodity-options

dealings; (9) the nationwide investigation and financial collapse of Lloyd, Carr & Co., the largest commodity-options firm in the country; (10) the subsequent receivership proceeding, which involved a search for missing assets in several foreign countries; and (11) not least of all, Abrahams' luxurious lifestyle funded by his ill-gotten gains.

*Id.* at 752.  The District of Massachusetts held that this "extensive pretrial publicity in all Boston media with respect to the allegedly unlawful behavior of the defendant . . . , [the] defendant's prior convictions, and the other charges pending against him ha[d] created in the District of Massachusetts an atmosphere of pervasive community prejudice so inflammatory as to substantially reduce the reasonable likelihood of Abrahams obtaining a fair trial before a panel of impartial jurors anywhere in th[e] District."  *Id.* at 753.  The court then transferred the case to the Western District of Texas.  *Id.* at 754.

Again, the coverage of Mr. Lindemuth's prior activities does not compare to the coverage in *Abrahams*.  Unlike *Abrahams*, none of the articles here report conduct by Mr. Lindemuth that is similar to the crimes he is charged with.  In *Abrahams*, the defendant was charged with lying to the court, and the news reports detailed his lengthy past of lying and fraud.  Here, Mr. Lindemuth is charged with bankruptcy fraud by concealment, money laundering, and receiving firearms and ammunition while under indictment.  The six articles that concern the court mention various incidents.  Two report that Mr. Lindemuth fired at or actually shot intruders, but no charges were filed for that reported conduct.  Another article reports that Mr. Lindemuth drove his truck through a tenant's store front, but no charges were filed for that conduct either.  A fourth article reported that Mr. Lindemuth allegedly stole from his previous employer but no charges were filed.  Finally, two articles report that Mr. Lindemuth was charged with two counts of criminal threat in state court and that he was convicted on just one of those two counts.  Although these articles show that Mr. Lindemuth owns firearms, they include no information

that would suggest that he is likely to commit bankruptcy fraud or money laundering. And, though the articles could be seen as influencing the public's opinion on the receipt-of-firearms and ammunition charges, their otherwise low prejudicial value distinguishes them from the articles in *Abrahams*.

The court is not convinced that the prejudice these six articles could engender is sufficient to establish presumptive prejudice and thus require a transfer. Five of the six articles were published between January 2014 and May 2015—more than two years before Mr. Lindemuth will stand trial. Doc. 44-1 at 12, 17, 43, 49. The only article published after Mr. Lindemuth's indictment is the January 24, 2017 article that mentions that Mr. Lindemuth was charged with two counts of criminal threat in Kansas state court. But, this article shares the same prejudice-diminishing qualities as the earlier five articles and so its timing does not trouble the court. None of the articles sensationalize or editorialize. They simply recite facts that are available in the public record or were recited at court hearings open to the public. And, five of the six articles do not report that Mr. Lindemuth was either charged or arrested. They merely discuss incidents involving Mr. Lindemuth. As for the January 24, 2017 article, a later article explaining that a jury had acquitted Mr. Lindemuth of one of the two criminal-threat charges likely diminishes the prejudice that the article could engender. Altogether, then, the articles about Mr. Lindemuth's potentially criminal past are far less troubling than the articles in *Abrahams*. Because the articles, by and large, do not speak to Mr. Lindemuth's tendency to commit the crimes charged in the Indictment and have an otherwise low prejudicial value, the court finds that these articles fail to establish that presumptive prejudice exists.

<u>d.</u>　　　<u>All Articles Combined</u>

Even viewing the 46 articles Mr. Lindemuth submitted as a whole, the court's conclusion remains the same:  Mr. Lindemuth has not established that presumptive prejudice exists.  Mr. Lindemuth argues that the combined weight of all these articles is enough to require a venue change.  The court disagrees.  The combined effect of the articles does not amount to evidence that the Topeka community is convinced already that Mr. Lindemuth is guilty.  At most, the articles show that Mr. Lindemuth has received some undesirable press in the past and that some Topeka residents were affected by his bankruptcies—some positively, some negatively.  But, as the Supreme Court explained in *Skilling v. United States*, the sheer number of people affected by a defendant's actions alone is not sufficient to "trigger a presumption of prejudice."  561 U.S. at 384.  Mr. Lindemuth nonetheless asserts that none of the articles say anything positive about him.  This too is not sufficient to establish presumed prejudice.  Here, as in *Skilling*, some of the pre-trial publicity about Mr. Lindemuth was unkind, but it contained "no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.* at 382; *see also id.* at 387.  And, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial."  *Id.* at 384 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)).  Mr. Lindemuth is a visible figure in the Topeka community.  So it is natural that the news media would write about his successes, and it is even more natural that they would write about his difficulties.  *See Abello-Silva*, 948 F.2d at 1176 ("Pre-trial publicity in topical criminal cases is inevitable.").  But general coverage about an individual, even if unflattering, is not sufficient to warrant a venue change, especially when, as here, most of the coverage has nothing to do with the pending criminal charges and predates the criminal case by several years.  Thus, just as the Supreme Court held in *Skilling*, the court

concludes that the "negative print" Mr. Lindemuth complains of here is not of the type to require a venue change. Doc. 52 at 1; 561 U.S. at 387.

Mr. Lindemuth has failed to show that the articles in the record establish that an irrepressibly hostile attitude against him pervades the Topeka community. Mr. Lindemuth has not established that he cannot receive a fair trial in Topeka or presumptive prejudice. But, before the court reaches a final ruling, it considers whether the online comments that Mr. Lindemuth submitted alters its opinion.

<u>e.</u>    <u>Online Comments</u>

As mentioned earlier, Mr. Lindemuth submitted nine pages of comments written by the *Topeka Capitol Journal*'s online readers. These comments were posted under several of the articles the court has discussed, and under several articles that Mr. Lindemuth did not include in the record. The court does not consider reader comments publicity—that is, at least not in the sense that the relevant case law uses the term. *Cf. United States v. Philpot*, No. 2:11-CR-133-JTM-PRC, 2012 WL 2064620, at *3 (N.D. Ind. June 7, 2012), *aff'd*, 733 F.3d 734 (7th Cir. 2013). At the same time, the court acknowledges that the difference between reader comments and editorials written by the public is small. Both can be written and seen by anyone, and both express an individual's opinion. But, editorials are selected by the media outlet and published under its masthead, which lends credibility and support to the author's opinion. *See Daniels*, 428 F.3d at 1211 (finding letters from the public published by a local paper prejudicial). Reader comments posted online do not receive the same treatment, or share any perception of legitimacy. *See United States v. Philpot*, 733 F.3d 734, 741 (7th Cir. 2013) ("[F]ew readers would take the comments section of an online news story to be anything but mostly-anonymous opinions."). The media outlet simply provides readers with a forum to share their thoughts about

20

an article; it does not lend those thoughts any legitimacy. This difference leads the court to

question whether reader comments may be treated as "pre-trial publicity" when considering

whether presumptive prejudice exists. Mr. Lindemuth cites no authority to support his reliance

on such comments. And the government cites no authority suggesting that a defendant cannot

rely on such comments. Under these circumstances, the court may decline to consider the

parties' arguments. *See, e.g.*, *Cease v. Safelite Glass Corp.*, 911 F. Supp. 477, 483 (D. Kan.

1995) (finding the parties' briefing insufficient to answer the question before the court and so

declining to rule on the issue). The court does not apply such a drastic outcome here, but

considers this a borderline case.

The court's research shows that the online reader comments here warrant no transfer.

The court located just one case in our district that mentions such comments—*Llizo v. City of*

*Topeka*, 844 F. Supp. 2d 1212 (D. Kan. 2012), a civil case decided by Judge John W. Lungstrum.

There, the defendant sought a change of venue from the Kansas City federal courthouse to the

Topeka federal courthouse based on convenience. 844 F. Supp. 2d at 1213. The plaintiff

contested the transfer, arguing that negative publicity in Topeka would prevent her from

receiving a fair trial there. *Id.* at 1215. For support, the plaintiff submitted articles from the

*Topeka Capital Journal* and those articles' online reader comments. *Id.* He briefly discussed the

online comments, noting that "the vast majority" of them "reflect[ed] a negative and even hostile

attitude toward [the] plaintiff." *Id.* Judge Lungstrum also noted that, though the defendant was

correct that the comments "were not necessarily made by Topeka residents (*i.e.,* anyone with

computer access can leave a comment on the website)," he found that "it [was] reasonable to

infer from the substance of the comments that the individuals making those comments [were],

more likely than not, individuals with ties to the Topeka area." *Id.* Nonetheless, Judge

Lungstrum held that the court "undoubtedly could address th[e] pretrial publicity and alleged prejudice through the voir dire process" and that he was "confident that an impartial jury could be selected in Topeka as a result." *Id.*

Although *Llizo* is a helpful starting point, the court hesitates to rest its decision here on a single, civil case decided under a different rule and statute. Luckily, the court has located a wealth of criminal cases discussing online comments from Kansas state courts,[6] other federal district courts,[7] and even the Seventh Circuit. In each on of these cases, the court held that online comments did not warrant a venue change. The reasoning in each was a variation on the same theme: the court had no way of knowing whether the commenters were eligible jurors, residents of the forum state, or even whether they were identifiable individuals;[8] and the defendants "offer[ed] no data to show what percentage of newspaper readers, or potential jurors, had read the print versus the online versions of the articles, what percentage of those who read the online versions also read the comments, or what readers' attitudes are of the online

---

[6] *See, e.g.*, *Kansas v. Chapman*, –P.3d–, 2017 WL 1534225, at *2–3, *5–6 (Kan. Apr. 28, 2017) (affirming district court's denial of a transfer motion despite the defendant's claim, with some evidence to support it, that more than 800 residents in the district had made negative online comments); *Kansas v. Ford*, 302 P.3d 1098, 2013 WL 3330312, at *3–4 (Kan. Ct. App. June 28, 2013) ("[A] small sampling of online negative comments, not necessarily from Butler County, does not show that fair jurors could not be found in Butler County." (citation omitted)); *Kansas v. Parker*, 282 P.3d 643, 652 (Kan. Ct. App. 2012) (affirming denial of a transfer motion despite online comments that "showed bias against whoever committed the crime, a person many assumed to have been [the defendant]" because those comments, and the pre-trial media coverage in the case as a whole, didn't "show that fair jurors couldn't be found in Salina").

[7] *See, e.g.*, *United States v. Benzer*, No. 2:13-CR-00018-JCM, 2014 WL 7359078, at *13 (D. Nev. Dec. 24, 2014) (denying motion to transfer based on online comments for many of the same reasons applied by the district court in *United States v. Philpot*, discussed *infra*); *United States v. Warren*, 989 F. Supp. 2d 494, 500 (E.D. La. 2013) (holding that online comments didn't warrant transfer because there was "no evidence that the[] comments [were] representative of the hundreds of thousands of individuals who are eligible to serve as jurors in the Eastern District of Louisiana"); *United States v. Salad*, 915 F. Supp. 2d 755, 759 (E.D. Va. 2012) (characterizing anonymous online comments as "unpersuasive, or irrelevant, commentary"); *United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 800–02 (W.D. Pa. 2010) (holding that online comments did not "demonstrate that news stories concerning th[e] case continue[d] to generate public interest and/or that the public ha[d] fixed opinions about the Defendant's guilt or innocence," where the relevant articles had few comments—especially in comparison to other articles published at the same time—and many, if not most, of the commenters did not reside in the reach of the court's jury pool).

[8] *E.g.*, *United States v. Jacques*, No. 08-117, 2011 WL 1706770, at *8 (D. Vt. May 4, 2011); *United States v. Agriprocessors, Inc.*, No. 08-CR-1324-LRR, 2009 WL 721715, at *4 (N.D. Iowa Mar. 18, 2009), *reconsideration denied*, 2009 WL 1833598 (N.D. Iowa June 18, 2009).

22

commentary written by other readers." *Philpot*, 2012 WL 2064620, at *3. But perhaps the most salient point comes from the Northern District of Iowa in *United States v. Agriprocessors, Inc.* It observed: "It would be irresponsible for the court to categorically impute the vitriolic comments of those who post comments in online newspapers and on other websites to the jury pool." 2009 WL 721715, at *4. Indeed, two years after *Agriprocessors, Inc.*, the District of Vermont echoed the same sentiment: "That there are individuals with access to the Internet who are willing to post their strong opinions about the case does not provide evidence that potential jurors in the District of Vermont believe that [the defendant] is guilty . . . ." *Jacques*, 2011 WL 1706770, at *8.

The comments Mr. Lindemuth submitted here suffer from the same deficiencies as the online comments considered by other courts. Just as in the cases referenced above, the fact that many of the comments here show the author's belief that Mr. Lindemuth is guilty of the crimes he is charged with—and several crimes that he isn't—is not sufficient to warrant a transfer. The Topeka division has some 121,600 potential jurors and roughly 29,000 qualified jurors. The court has no way of knowing whether any of the commenters are members of this group. The court also has no way of knowing whether the online comments in the record reflect the attitude of most of the potential jurors, or even of most Topeka residents. In fact, a cursory review of the online versions of the articles Mr. Lindemuth has submitted undermines any such conclusion. Some of the articles have no comments, and others have only two or three.

Mr. Lindemuth also has not submitted any evidence showing how many potential jurors read the comments or what those potential juror's reactions to the comments were. As one commenter wrote: "Of course Lindemuth and his attorney want the trial moved, but to say that there's NO ONE who would be fair and unbiased is not true; many people don't even know who

he is." Doc. 52-1 at 1. And indeed, the Topeka division's jurors come from 17 counties across the State of Kansas, specifically: Brown, Chase, Clay, Dickinson, Geary, Jackson, Jefferson, Lyon, Marshall, Morris, Nemaha, Osage, Pottawatomie, Riley, Shawnee, Wabaunsee, and Washington. D. Kan. R. 38.1(a)(3). These counties stretch across a wide swath of the state. For instance, Mahaska, Kansas, a town located in northern Washington County, Kansas, is about 150 miles from Topeka. And Burns, Kansas, a town located in southern Chase County, Kansas, is more than 100 miles from Topeka. So it is possible that many of the Topeka division's potential jurors have neither read online comments about Mr. Lindemuth nor heard of Mr. Lindemuth. In light of the uncertainty present here, the court agrees with *Jacques* and *Agriprocessors, Inc.* and declines to impute the biased opinions of those who posted online comments about Mr. Lindemuth to the entire jury pool.

Moreover, the court believes that the solution to the problem that these comments may pose is a thorough voir dire, not a venue change. Like Judge Lungstrum in *Llizo*, the court is confident that it can weed out any jurors who have written or been exposed to and prejudiced by these online comments during jury selection. Indeed, voir dire is designed for just that purpose. The court also notes that most if not all the commenters posted under what appears to be their given names. So, again, voir dire can easily remove them from the jury pool. Thus, even when assuming—without deciding—that online, reader comments are proper to consider under Rule 21(a), the comments in the record here do not establish presumptive prejudice.

<u>f.</u>    Conclusion

In sum, as the transfer motion's proponent, Mr. Lindemuth bears the difficult task of establishing that presumptive prejudice exists. He has not carried this burden. Neither the articles nor the comments before the court establish presumptive prejudice. Even the combined

weight of the articles and comments together does not persuade the court that facts supporting presumed prejudice exist.

Perhaps a person who read all of the articles and comments back-to-back in one sitting may develop the impression of general community dislike for Mr. Lindemuth, but the court reviews the articles and comments as the public read them: as separate articles, published at discrete times, over the course of more than four years. Viewing the evidence in this light and for the reasons explained above, the court concludes that Mr. Lindemuth has not shown that the pre-trial publicity of this case warrants a change of venue under Rule 21(a).

The court now turns to consider Mr. Lindemuth's motion to change venue under Rule 21(b).

### B. Transfer Under Rule 21(b)

Under Rule 21(b), "the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Courts often consider the following ten factors to determine whether to transfer a case under Rule 21(b): (1) location of the defendant; (2) location of witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of the defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements that might affect the transfer. *United States v. Cheng Feng*, Nos. 05-40095-01-JAR, 05-40095-03-JAR, 2007 WL 4144921, at *4 (D. Kan. Nov. 19, 2007) (citing *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243–44 (1964)); *see also United States v. Calabrese*, 645 F.2d 1379, 1384 (10th Cir. 1981) (discussing several of the factors mentioned in *Platt* and citing that case). Here,

the parties agree that factors five and ten do not apply. The court thus considers only factors one through four and six through nine.

Factors one, six, and seven favor holding the trial in Topeka. Mr. Lindemuth lives in Topeka, so factor one favors Topeka. The government reports that, should the trial move to Kansas City, it would have to pay for the Topeka-based prosecutor's and two case agents' room and board throughout the trial. Doc. 51 at 9. Mr. Lindemuth contends that the short distance between Topeka and Kansas City minimizes the added expense to the government. Although this may be true, the government still will sustain some added expense of money and other resources if the trial takes place in Kansas City. Factor six thus favors Topeka, albeit slightly. Counsel for the government works in Topeka; whereas, counsel for Mr. Lindemuth works out of Lawrence, Kansas, and so travel for defense counsel to either courthouse is similar, though Topeka is slightly closer. Factor seven thus favors Topeka, though again, only slightly.

Factors two, three, four, eight, and nine are neutral. Mr. Lindemuth reports that several of his potential witnesses work and/or reside in Kansas City. The government reports that five or six of its witnesses reside or work in Topeka and that one of its case agents works or resides in Topeka, while the other works in Wichita, Kansas. At the April 3 hearing, Mr. Lindemuth's counsel asserted that the non-case agent witnesses mentioned by the government would testify about counts 114 and 115 only, which Mr. Lindemuth has asked the court to sever. So, Mr. Lindemuth contends, those Topeka witnesses should not "count" because counts 114 and 115 should be severed. At the April 3 hearing, the government conceded that Mr. Lindemuth is correct about the government's five or six Topeka-based, non-case-agent witnesses. Because the court has decided to grant Mr. Lindemuth's motion to sever, *see* discussion *infra* Part II, it declines to consider these five or six witnesses here. Nonetheless, Topeka still is an easier venue

for the government's other witnesses.  So, Kansas City is an easier venue for Mr. Lindemuth's potential witnesses whereas Topeka is an easier venue for the government's witnesses.  Factor two thus is neutral, favoring neither Kansas City nor Topeka.

The parties dispute factor three, the location of the events likely to be at issue at trial.  The government contends that the events at issue in this case occurred in Topeka because the property Mr. Lindemuth allegedly concealed was, or is, located there.  Mr. Lindemuth contends that the events at issue in this case occurred in Kansas City because all of his bankruptcy proceedings took place there.  But, in the age of electronic filing, deciding the location of a bankruptcy's events is a vexing problem.  There is no precise answer.  The best the court can do is to conclude that events in both Topeka and Kansas City will be at issue in this case.  On the facts before the court, then, factor three is neutral.

Mr. Lindemuth reports that he may rely on documents held by his Kansas City-based witnesses, and the government reports that most of its documents are in Topeka.  So, the documents here are spread in some unknown proportion between Kansas City and Topeka, making factor four neutral.  As for factor eight, Mr. Lindemuth contends that no difference exists between the accessibility of the Topeka and Kansas City courthouses.  The government contends that its case will be easier to try in Topeka because it will not need to requisition staff from another office like it would if the trial took place in Kansas City.  This argument goes more to the parties' expense than the accessibility of the Kansas City courthouse, however, and so has little persuasive value.  The court thus agrees with Mr. Lindemuth—few differences exist between the accessibility of the Topeka and Kansas City federal courthouses.  Factor eight thus is neutral.

Finally, the government contends that factor nine favors Topeka because the court can oversee its docket more easily from its home courthouse. The court appreciates the government's concern for its ease, but finds that its docket condition is the same whether the trial takes place in Topeka or Kansas City. Factor nine thus is neutral as well.

Of the ten factors to consider, then, three favor a Topeka trial and the other seven either are not at issue or are neutral. The court thus denies Mr. Lindemuth's motion to change venue under Rule 21(b).

## II.    Motion to Sever Counts 114 and 115

Mr. Lindemuth's motions include one seeking to sever, for trial, counts 114 and 115 from the rest of the charges in the Indictment. Doc. 46. This motion would require, if granted, two separate trials to decide the existing charges against Mr. Lindemuth.

Rule 8(a) allows the government to charge a defendant with multiple offenses, set off in different counts, when the charged offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Mr. Lindemuth contends that counts 114 and 115 do not meet this standard. The court agrees.

Counts 114 and 115 charge Mr. Lindemuth with receiving a firearm and ammunition while under indictment in this case. The remaining counts of the Indictment charge Mr. Lindemuth with concealing assets from the bankruptcy court (counts 1–104 and 111–113) and money laundering (counts 105–110). All of those counts arise from allegations that Mr. Lindemuth concealed property and assets from the bankruptcy court. Nothing in counts 114 and 115 involves Mr. Lindemuth concealing property or assets from the bankruptcy court. Indeed, the conduct that Mr. Lindemuth is charged with committing in counts 114 and 115 occurred

almost a year after his bankruptcy cases closed.  So, the offenses charged in counts 114 and 115 are not based on the same act or transaction as those in the remaining counts of the Indictment, nor are they of the same or similar character or connected with parts of a common scheme or plan.

The government contends that it properly joined counts 114 and 115 with the rest of the Indictment because "the evidence overlaps concerning Counts 114 and 115 with the indictment, and the evidence is inextricably intertwined."  Doc. 51 at 18.  Though this may or may not be true, the fact that evidence may overlap for various charges is not enough, on its own, to make joinder proper under Rule 8(a).  *See United States v. Esch*, 832 F.2d 531, 538 (10th Cir. 1987) ("Where the evidence overlaps, the offenses are similar and the operable events occurred within a relatively short span of time, joinder of defendants and offenses is proper." (citing *United States v. Riebold*, 557 F.2d 697, 707 (10th Cir. 1977))); *United States v. Evans*, No. CR-14-247, 2015 WL 114754, at *1 (W.D. Okla. Jan. 8, 2015) ("Joinder is allowed when the evidence overlaps and the offenses arise from the same series of acts or transactions . . . ." (citing *United States v. Wright*, 932 F.2d 868, 876 (10th Cir. 1991), *overruled on other grounds by United States v. Flowers*, 464 F.3d 1127 (10th Cir. 2006))).  Nonetheless, the court considers the government's argument about overlapping evidence here to decide whether joinder is proper counts 114 and 115.

The government rests its overlapping-evidence argument on the contention that severing counts 114 and 115 "would not serve to disconnect the charge[s] from the indictment because the government would have to prove up the existence of the indictment, and [Mr. Lindemuth's] involvement in it, as part of any severed case."  Doc. 51 at 16.  This seems right, but does not make joining counts 114 and 115 with the rest of the Indictment proper.  The only evidence that

counts 114 and 115 share with the Indictment's other 113 counts is the existence of the

Indictment itself. This case is not one where the evidence for separate counts overlaps

substantially, and certainly not substantially enough to conclude that the two counts are part of

the same transaction, similar in character, or part of a common scheme or plan. *Cf. Esch*, 832

F.2d at 538 (finding joinder proper where the counts charged all defendants with producing

photographs and mailing those photographs because "the evidence overlap[ed]" so joinder of the

"offenses [was] proper").

At the April 3, 2017 hearing, the government raised a new reason for joining counts 114

and 115 with the rest of the Indictment. There, it argued that Mr. Lindemuth's purchase of the

guns and ammunition at issue in counts 114 and 115 is similar in character to the other 113

counts of the Indictment because he allegedly attempted to conceal purchases of the property on

which counts 114 and 115 rely. The government does not contend, however, that Mr. Lindemuth

attempted to conceal the purchases in the same manner as he allegedly concealed the property

and assets at issue in the Indictment's bankruptcy fraud and money laundering counts. Instead,

the government simply contends that the similarity among all these counts is that Mr. Lindemuth

tries to conceal things from various authorities.

This alleged similarity is too tenuous to support joinder under Rule 8(a). Although the

court must "construe Rule 8 broadly to allow liberal joinder to enhance the efficiency of the

judicial system,"[9] not just any similarity in character between counts will do. *See United States

v. Wood*, No. 14-20065-01-JAR-JPO, 2016 WL 6680956, at *3 (D. Kan. Nov. 14, 2016) ("While

joinder is to be liberally construed, the counts must be logically connected in some way, beyond

---

[9] *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997) (citation omitted).

the generality of a motive to illegally obtain money.").[10]  In *United States v. Wood*, for instance, our court granted a defendant's motion to sever ERISA charges from bank fraud, wire fraud, and aggravated identity theft charges because the "only common theme" the government articulated was the "[d]efendant's motive to enrich herself and to keep her businesses afloat."  2016 WL 6680956, at *2–3.  Our court held that this similarity was too general to provide the necessary "logical connection" between the charges.  *Id.*

The government's similarity argument here suffers the same problems as the government's argument in *Wood*.  The only common similarity between the bankruptcy fraud, money laundering counts, and the possession of a firearm/ammunition while under indictment counts is that Mr. Lindemuth broke the law and tried to keep the authorities from discovering it. If this similarity were enough, virtually no limits would remain in Rule 8(a).  It would permit a level of generality that—as the First Circuit warned—"drain the [rule] of any real content." *Randazzo*, 80 F.3d at 628.

Because the court finds that counts 114 and 115 and the Indictment's other 113 counts are not of the same or similar character, based on the same act or transaction, or parts of a common scheme or plan, it grants Mr. Lindemuth's Motion to Sever Counts 114 and 115.

## III.  Motions to Dismiss Counts of the Indictment

Mr. Lindemuth's two other motions seek dismissal of certain counts of the Indictment. Although these two motions present very different arguments and questions, both are controlled by the same legal standard.  The court thus considers Mr. Lindemuth's Motion to Dismiss

---

[10] *See also United States v. Randazzo*, 80 F.3d 623, 628 (1st Cir. 1996) ("But whatever the rationale, we think that it is very hard to describe adulterating or mislabeling shrimp as offenses 'similar' to tax fraud—except at a level of generality so high as to drain the term of any real content."); *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992) (holding that joinder of bank fraud and mail fraud charges was proper where "[t]he indictment alleged that [the defendant] attempted to defraud the governmental entities with falsified receipts, and attempted to defraud his bank through falsified loan documentation" and "both classes of fraud arose out of the operation of his business").

Counts 1–103, 104, and 111 (Doc. 47) and his Motion to Dismiss Counts 1–103 (Doc. 48) under the legal standard detailed in the following section.

### A. Motion to Dismiss Indictment Standard

"An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)). "Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Id.* (citing *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)). "Rather, '[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true.'" *Id.* (quoting *Hall*, 20 F.3d at 1087; then citing *United States v. Sampson*, 371 U.S. 75, 78–79 (1962)). "Courts should therefore avoid considering evidence outside the indictment when testing the indictment's legal sufficiency." *Id.* (citing *Hall*, 20 F.3d at 1087).

### B. Motion to Dismiss Counts 1–103, 104, and 111

In his first Motion to Dismiss, Mr. Lindemuth contends that counts 1 through 104 and 111 present multiplicity problems. Doc. 47 at 1. The term *multiplicity* refers to multiple counts of an indictment that "cover the same criminal behavior." *United States v. Barrett*, 496 F.3d 1079, 1095 (10th Cir. 2007) (quoting *Johnson*, 130 F.3d at 1424). "[M]ultiplicity is not fatal to an indictment" but, "multiplicitous counts which may result in multiplicitous convictions are considered improper." *Id.* (quoting *Johnson*, 130 F.3d at 1424). This is so because multiplicitous convictions "allow multiple punishments for a single criminal offense," and thus

violate the Double Jeopardy Clause. *Id.* (quoting *United States v. Jenkins*, 313 F.3d 549, 557 (10th Cir. 2002)).

To determine whether an indictment contains multiplicitous counts in a case like this one, courts "look to the applicable criminal statute to see what the allowable 'unit' of prosecution is." *United States v. Allender*, 62 F.3d 909, 912 (7th Cir. 1995) (citing *United States v. Song*, 934 F.2d 105, 108 (7th Cir. 1991)). In other words, courts ask whether the statute at issue prohibits the "individual acts" charged in the allegedly multiplicitous counts or the "course of [conduct] which they constitute." *Barrett*, 496 F.3d at 1095 (citation omitted); *see also United States v. Graham*, 305 F.3d 1094, 1100 (10th Cir. 2002) ("The test is whether the individual acts are prohibited, or the course of [conduct] which they constitute." (quoting *Blockburger v. United States*, 284 U.S. 299, 302 (1932))). "If the former, then each act is punishable separately. If the latter, there can be but one penalty." *Barrett*, 496 F.3d at 1095 (quoting *Graham*, 305 F.3d at 1100).

But this does not mean that courts must always dismiss multiplicitous counts before trial. *Ball v. United States*, 470 U.S. 856, 865 (1985). As the Supreme Court explained in *Ball v. United States*:

> If, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense. Should the jury return guilty verdicts for each count, however, the district judge should enter judgment on only one of the statutory offenses.

*Id.* The Tenth Circuit has applied *Ball*'s rationale and holding to cases like this one, where the defendant argues multiplicity but just one statute is at issue. *E.g.*, *United States v. Moore*, 958 F.2d 310, 314 (10th Cir. 1992) (applying *Ball* to multiple convictions under 18 U.S.C. § 924(c)(1)).

Here, Mr. Lindemuth contends that the Indictment is multiplicitous in three ways: (1) counts 104 and 111 are multiplicitous; (2) counts 1 through 103 and 104 are multiplicitous; and (3) counts 1 through 103 are multiplicitous. Because Mr. Lindemuth advances different arguments to support each of these three alleged multiplicity violations, the court considers each alleged violation, separately, below.

### 1. Counts 104 and 111: Pre-Bankruptcy Petition Concealment

Counts 104 and 111 charge Mr. Lindemuth with similar crimes. In count 104, the Indictment charges him with bankruptcy fraud under 18 U.S.C. § 152(1) for concealing the existence of a bank account at Envista Credit Union when he filed for bankruptcy and for concealing more than $250,000 in deposits made to that account during the pendency of his bankruptcies. In count 111, the Indictment charges Mr. Lindemuth with bankruptcy fraud under 18 U.S.C. § 152(1) for concealing the existence of a bank account at US Bank when he filed for bankruptcy and for concealing more than $1.5 million in deposits to that account during the pendency of his bankruptcies. Mr. Lindemuth contends that counts 104 and 111 represent only one offense because concealing multiple pieces of property or assets from a bankruptcy petition constitutes just one offense. This is so, he asserts, because debtors have but one duty to disclose property at the outset of bankruptcy proceedings.

Our Circuit has not considered this precise issue,[11] but several circuit courts have considered it. They seem to agree with Mr. Lindemuth's evaluation of the law and hold that failing to disclose several pieces of property that exist when bankruptcy petition is filed does not give rise to a separate charge under 18 U.S.C. § 152(1) for each piece of property concealed. *United States v. White*, 879 F.2d 1509, 1512 (7th Cir. 1989); *United States v. Moss*, 562 F.2d

---

[11] *See United States v. Moser*, 453 F. App'x 762, 765–66 (10th Cir. 2011) (considering whether concealing multiple pieces of property post-bankruptcy gives rise to separate offenses for each piece and holding that it does).

155, 160 (2d Cir. 1977); *United States v. Harris*, 388 F.2d 373, 376 (7th Cir. 1967); *Edwards v. United States*, 265 F.2d 302, 306 (9th Cir. 1959); *see also Tugendhaft v. United States*, 563 F. 562, 563 (5th Cir. 1920) (holding that an indictment that charged a defendant with concealing several pieces of property from the bankruptcy petition charged "but a single offense").[12]

Those circuits base their holdings on an evaluation of the congressional intent behind 18 U.S.C. § 152(1) that the court does not question. *See United States v. Melton*, 763 F.2d 401, 402 (11th Cir. 1985); *Edwards*, 265 F.2d at 306. Moreover, their holding comports with the Supreme Court's guidance in *Blockburger v. United States* that, "when the impulse is single, but one indictment lies, no matter how long the action may continue." 284 U.S. at 302 (quoting *Wharton's Criminal Law* § 34 (11th ed.)). The duty to disclose the existence of property under 18 U.S.C. § 152(1) does not arise until the bankruptcy petition is filed,[13] so the decision to omit several pieces of property from the bankruptcy petition is just one impulse. As a result, "the fraudulent nondisclosure of several items of property in the petition for bankruptcy [is] a 'single continuous concealment' constituting a single offense." *White*, 879 F.2d at 1512 (quoting *Tugendhaft*, 563 F. at 563); *see also Edwards*, 265 F.2d at 306. Because this conclusion comports with *Blockburger*, the court reasons that the Tenth Circuit would agree with its circuit counterparts and hold that concealing several assets or pieces of property that pre-existed the

---

[12] The court recognizes that some authority seems to treat pre-bankruptcy activity as capable of constituting separate offenses. *See* Ralph C. McCullough, II, *Bankruptcy Fraud: Crime Without Punishment II*, 102 Com. L.J. 1, 37–38 (1997) ("Although courts do not observe the distinction strictly, there is a tendency to treat most concealment prior to a petition as a single offense, and to consider post-petition concealment and transfers as separate offenses. Separate transfers made in contemplation of bankruptcy, on the other hand, are more likely to be treated as separate offenses." (footnotes omitted)). Those cases, however, discuss 18 U.S.C. § 152(7) or § 152(8)—and not § 152(1), the legal theory charged by counts 104 and 111. *E.g.*, *United States v. McClellan*, 868 F.2d 210, 212–14 (7th Cir. 1989); *Dranow v. United States*, 307 F.2d 545, 55–59 (8th Cir. 1962). The difference between these subsections is material. Thus, cases discussing pre-bankruptcy-petition activity under § 152(7) and § 152(8) do not control the court's decision here.

[13] *Edwards*, 265 F.2d at 306.

bankruptcy petition does not give rise to separate charges under 18 U.S.C. § 152(1) for each asset or piece of property concealed.

But even if our Circuit did adopt this rule, Mr. Lindemuth would not be entitled to the relief that his motion seeks. It is true that counts 104 and 111 charge Mr. Lindemuth with concealing two separate bank accounts from his bankruptcy petitions. And if these were the only concealments charged by counts 104 and 111, they might constitute multiplicitous charges. But, counts 104 and 111 also charge Mr. Lindemuth with concealment based on post-petition conduct: concealing deposits of more than $250,000 into the Envista account and concealing deposits of more than $1.5 million into the US Bank account. In *United States v. Butler*, the Eastern District of Virginia held that two counts of bankruptcy fraud were not multiplicitous where at least one of the counts alleged "a fraudulent transfer and concealment that continued after the bankruptcy." 704 F. Supp. 1338, 1345 (E.D. Va. 1989), *aff'd*, 905 F.2d 1532 (4th Cir. 1990). *Butler*'s reasoning on that point is persuasive and so the court adopts it here. Counts 104 and 111 are not multipicitous because they charge Mr. Lindemuth with both pre- and post-petition concealment. And, even if they were multiplicitous, the court would deny Mr. Lindemuth's motion at this point and allow both charges to proceed to trial, where the court would comply with *Ball* and subsequent Tenth Circuit case law. The court thus denies Mr. Lindemuth's motion to dismiss count 104 or count 111 as multiplicitous.

2. *Counts 1 through 103 and 104: Independent Actions*

Mr. Lindemuth next contends that counts 1 through 103 are multiplicitous of count 104 because, he asserts, he purchased the firearms that he is charged with concealing in counts 1 through 103 with the funds he's charged with concealing in count 104. Doc. 47 at 7. The government does not respond to this argument.

36

Mr. Lindemuth's multiplicity argument here involves post-petition conduct—a topic that our Circuit has addressed. In *United States v. Moser*, the Tenth Circuit held that, "where each offense requires proof of a different act, each concealment can be charged separately." 453 F. App'x at 766 (citing *Blockburger*, 284 U.S. at 304). So, for example, the government can charge "separate concealments of different property interests" as separate offenses without presenting a multiplicity problem. *Id.* In arriving at its holding, the Tenth Circuit relied on the following passage in the Second Circuit's decision in *United States v. Moss*:

> "[w]hen the concealment of assets belonging to the bankrupt occurs after a receiver or Trustee has been appointed . . . each separate act of concealment is a separate violation of [Section 152]. . . . In each such instance there is a separate act, taken at a discrete time, accompanied by the requisite intent."

*Id.* (quoting *Moss*, 562 F.2d at 160).

Mr. Lindemuth's motion presents a question whether *Moser* and *Moss* apply to him because, unlike in those cases, he acted as a debtor-in-possession during his bankruptcies, so no receiver or trustee ever was appointed. The Tenth Circuit noted but did not decide a similar question in *United States v. Beery*, 678 F.2d 856, 865 n.7 (10th Cir. 1982). Other courts, however, hold that, "once bankruptcy has been filed, each separate act of transfer or concealment is a separate violation of the statute." *Butler*, 704 F. Supp. at 1345 (citing *Melton*, 763 F.2d at 402; *Moss*, 562 F.2d at 160). Indeed, many cases discussing multiplicity issues under § 152 consider filing the bankruptcy petition as the dividing line between concealing several assets constituting just one offense (pre-petition or pre-bankruptcy concealment) and concealing several assets constituting separate offenses. *See, e.g.*, *United States v. Kaldenberg*, 429 F.2d 161, 163 (9th Cir. 1970) ("Here, of course, there were seven entirely separate and distinct concealments, each of which occurred after the petition had been filed."); *Edwards*, 265 F.2d at 306 (holding that duty to disclose arose on the day the debtor filed his bankruptcy petition and explaining that

no liability under § 152 existed before that date because "[t]here was then no officer of the bankruptcy court charged with the control or custody of such property, and there were then no creditors in any bankruptcy proceeding pending against the corporation"). The reasoning of these circuit decisions is persuasive and the court concludes that the Tenth Circuit also would conclude that the filing of a bankruptcy petition is the starting point of liability for separate concealments under § 152. The court thus applies cases like *Moser* and *Moss* here, despite Mr. Lindemuth's debtor-in-possession status.

Mr. Lindemuth also relies on the same language in *Moss* as the Tenth Circuit did in *Moser*, arguing that, "[i]n this case, . . . counts 104 and counts 1–103 involve the same property, involve the same times, and involve the same intent," and so cannot constitute separate offenses. Doc. 47 at 7. Mr. Lindemuth contends that evidence in discovery shows that the firearm purchases were made using the allegedly undisclosed deposits from the Envista account and occurred nearly "immediately after a deposit [was] made," and so, at best, "the concealment alleged in counts 1–103 is a continuing one with no separate opportunity and time to form a new intent separate from the deposits described in count 104." *Id.* This argument relies on Mr. Lindemuth's characterization of the evidence and thus strays beyond the Indictment. So, the court may not rule on this basis on a motion to dismiss. *See Todd*, 446 F.3d at 1067 ("An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." (quoting *Hall*, 20 F.3d at 1087; further citation omitted)). But, even if the court could consider it, Mr. Lindemuth's argument still would fail.

Mr. Lindemuth's argument is similar to the defendant's argument in *Blockburger*. There, the defendant was convicted of three counts—counts two, three, and five of the indictment— charging the sale of morphine hydrochloride to the same purchaser. *Blockburger*, 284 U.S. at

301. "The second count charged a sale on a specified day of ten grains of the drug not in or from the original stamped package; the third count charged a sale on the following day of eight grains of the drug not in or from the original stamped package; the fifth count charged the latter sale also as having been made not in pursuance of a written order of the purchaser as required by the statute." *Id.* On appeal, the defendant argued that, "upon the facts, the two sales charged in the second and third counts as having been made to the same person constitute a single offense" because the evidence showed that, "shortly after delivery of the drug which was the subject of the first sale, the purchaser paid for an additional quantity, which was delivered the next day." *Id.* The Supreme Court rejected this argument. *Id.* at 301–02.

The Court held that "[t]he sales charged in the second and third counts, although made to the same person, were distinct and separate sales made at different times," resulting from separate impulses, and so could constitute separate offenses. *Id.* at 301; *id.* at 303. The Court explained that the defendant's actions did not constitute a single, continuing offense because "[t]he Narcotic Act does not create the offense of engaging in the business of selling the forbidden drugs, but penalizes any sale made in the absence of either of the qualifying requirements." *Id.* at 302. So, "[e]ach of several successive sales constitutes a distinct offense, however closely they may follow each other." *Id.* And, based on the evidence, "the first transaction, resulting in a sale, had come to an end," so "[t]he next sale was not the result of the original impulse, but of a fresh one—that is to say, of a new bargain." *Id.* at 303.

Applying the Supreme Court's rationale to the charges here, counts 1 through 103 are not multiplicitous of count 104. Counts 1 through 103 charge Mr. Lindemuth with buying 103 firearms on 71 different dates beginning about 10 months after he had commenced his bankruptcy cases. *See* Doc. 32 at 4–12. These 103 charges accuse Mr. Lindemuth of concealing

these 103 items of personal property from his creditors, the United States Trustee, and the bankruptcy court. Count 104 charges that Mr. Lindemuth owned a financial account at Envista Credit Union and that he likewise concealed this property from the same persons. This charge is less specific about when Mr. Lindemuth allegedly acquired his property interest is in this account, charging only that he owned the account from "on or about November 9, 2012"—when he filed his bankruptcy petitions—until the final bankruptcy decrees were entered on December 29, 2015. *Id.* at 13.

The Indictment thus charges two distinct collections of impulses, which comprise 104 separate and distinct impulses. The first collection—based on the 103 firearms that Mr. Lindemuth allegedly purchases between August 19, 2013, and December 29, 2014—theorizes a criminal impulse beginning when Mr. Lindemuth acquired each firearm. The second collection theorizes either: (a) one impulse (concealing the account's existence when Mr. Lindemuth filed his bankruptcy petitions); or (b) multiple impulses (concealing funds of $250,000 that he deposited into the account on an unspecified number of occasions) that the government has chosen to charge as one crime. Just like in *Blockburger*, the fact that the firearm purchases occurred close in time to the deposits does not make the two actions the product of a single impulse. Granted, it is possible that the impulse to conceal the deposits and the impulse to purchase and conceal firearms have resulted from a common scheme to conceal assets. But the test for multiplicity does not ask whether a defendant's actions resulted from an intent to carry out separate or related schemes. As the Supreme Court explained in *Blockburger*, "[i]f successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie." *Id.* at 302. That is the theory charged by the Indictment here— that Mr. Lindemuth took 104 separate, distinct actions in an effort to conceal property from the

bankruptcy court fraudulently.  And, as in *Blockburger*, 18 U.S.C. § 152(1) does not establish an offense for engaging in a scheme to conceal property.  Instead, it penalizes the knowing and fraudulent concealment of "any property belonging to the estate of a debtor" from creditors, 18 U.S.C. § 152(1).  Thus, "each separate act of concealment is a separate violation," *Moser*, 453 F. App'x at 766 (quoting *Moss*, 562 F.2d at 160).  Counts 1 through 104 therefore properly charge Mr. Lindemuth with 104 separate acts, taken at discrete times, accompanied by the requisite intent.  The court thus denies Mr. Lindemuth's motion to dismiss counts 1 through 103 or count 104 as multiplicitous.[14]

### 3.    Counts 1 through 103:  Unit of Prosecution

In his final multiplicity argument, Mr. Lindemuth contends that counts 1 through 103 are multiplicitous because they improperly make each firearm purchase the basis of an offense.  According to Mr. Lindemuth, the proper basis unit of prosecution is his alleged failure to disclose the firearm purchases in monthly bankruptcy reports.  Doc. 47 at 8–9.  So, instead of 103 counts, Mr. Lindemuth contends that the government can charge him with no more than 17 counts.  *Id.* at 9.  Mr. Lindemuth cites no authority for his position.  In response, the government, contends that these counts are not multiplicitous because the proper unit of prosecution is each firearm and cites as support many of the cases mentioned in the previous section.  The court agrees with the government.

Mr. Lindemuth argues, in essence, that counts 1 through 103 "are multiplicitous because they artificially separate the single offenses of purported failure to include these assets in monthly financial reports into multiple criminal offenses."  *Id.* at 1.  This characterization just

---

[14] The court is mindful that some of the charges comprising counts 1 through 103 accuse Mr. Lindemuth of acquiring more than one firearm on the same day.  *See, e.g.*, Doc. 32 at 5 (counts 6–8, 9–12).  Whether the granular facts about these alleged purchases presents one or more impulses is not an issue raised by Mr. Lindemuth's motion.  And, in any event, the court could not decide a multiplicity argument based on these single-date purchases on a motion to dismiss because such a decision would look outside the Indictment.

misapprehends the Indictment.  The government's "theory" of the Indictment, to use Mr.

Lindemuth's nomenclature, is not that he failed to disclose assets on monthly reports.  *Id.* at 9.

Instead, it is that he failed to disclose property and assets.  This is why counts 1 through 103 do

not charge Mr. Lindemuth with falsifying monthly reports—actions punishable by other

subsections of 18 U.S.C. § 152, such as § 152(2)—but rather charge him with "knowingly and

fraudulently conceal[ing], from creditors, and from the United States Trustee and the Bankruptcy

Court, property belonging to the bankruptcy estate" under 18 U.S.C. § 152(1).  Doc. 32 at 4, 12.

*Cf. United States v. Cluck*, 143 F.3d 174, 179 (5th Cir. 1998) ("§ 152(3) requires that the accused

make a 'false declaration, certificate, verification or statement under penalty of perjury' before

liability attaches, whereas § 152(1) contains no such prerequisite.").

Once the bankruptcy petition is filed, each act of failing to report property (*i.e.*,

concealing it) constitutes a separate offense under § 152(1).  *See Moser*, 453 F. App'x at 767

(holding that multiple counts of bankruptcy fraud under § 152(1) were not multiplicitous where

multiple property interests were not reported to the defendant's trustee).[15]  It is not improper, for

the Indictment to charge Mr. Lindemuth with 103 separate counts of concealment under 18

U.S.C. § 152(1) based on 103 distinct, undisclosed property interests.  *Cf. Moss*, 562 F.2d at 160

(holding that two counts involving "the execution of fraudulent affidavits of sale" for two

vehicles on the same day were not multiplicitous).  The court thus finds Mr. Lindemuth's

argument unpersuasive.

In his Reply, Mr. Lindemuth raises a new argument.  Instead, Mr. Lindemuth argues that

he had no duty to report a change in his assets until the monthly report was due because, as a

---

[15]*See also Moss*, 562 F.2d at 160 ("It is true that when the concealment of several items of property precedes the filing of the bankruptcy petition, the duty to disclose the transfers to the receiver or trustee is a single duty to reveal all.  When the concealment of assets belonging to the bankrupt occurs after a receiver or Trustee has been appointed, however, each separate act of concealment is a separate violation of the statute."  (citations omitted)).

debtor-in-possession, he had the right to possess the bankruptcy estate's property. Typically, the court will not consider arguments raised for the first time in a reply brief. *John Deere Health Benefit Plan for Salaried Emps. v. Chubb*, 45 F. Supp. 2d 1131, 1140 (D. Kan. 1999). Nonetheless, out of an abundance of caution, the court considers Mr. Lindemuth's argument.

As best the court understands his new argument, Mr. Lindemuth contends that, because no turnover order was in place requiring him to give possession of newly acquired assets to a receiver or trustee immediately, his duty to disclose was limited to disclosing new assets on a monthly report. Mr. Lindemuth cites no authority to support his argument, and so the court could decline to consider it. *See, e.g.*, *Mr. Elec. Corp. v. Khalil*, No. 06-2414-CM, 2013 WL 451584, at *7 (D. Kan. Feb. 6, 2013) (finding that the plaintiff did not cite authority to support its argument and so declining to address the argument); *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 n.1 (D. Kan. 1994) (denying summary judgment in part because "of the defendant's failure to brief [one of its] claim[s] properly"). But again the court considers his argument.

The court's research casts meaningful doubt on the existence of authority to support Mr. Lindemuth's argument. In *United States v. Beery*, the Tenth Circuit held that a debtor's duty to disclose assets exists before a turnover order is in place. 678 F.2d at 865 n.7. Adopting a rule to the contrary, the Circuit reasoned, "would encourage concealment until the assets were discovered and sought by the trustee" and thereby "clearly frustrate the intent of the statute." *Id.* So, the fact that Mr. Lindemuth may have been entitled to retain possession of the bankruptcy estate's assets does not alter his duty to disclose that the assets exist. Also, no authority presented here suggests that § 152(1) treats debtors-in-possession differently than any other debtor. The absence of such authority and the Tenth Circuit's decision in *Beery* lead the court to

conclude that Mr. Lindemuth's debtor-in-possession status does not alter the unit of prosecution analysis. To hold otherwise would provide debtors-in-possession with an incentive to conceal as many assets as possible in a given month because the rule endorsed by Mr. Lindemuth's argument would make a debtor-in-possession liable for just one count of bankruptcy fraud by concealment under § 152(1). This incentive is why the Tenth Circuit—as well as the other circuits discussed above—has held that a debtor is liable under § 152(1) for each post-petition asset concealed. *See Moser*, 453 F. App'x at 766. Thus, Mr. Lindemuth's Reply argument also fails to persuade the court.

### C.      Motion to Dismiss Counts 1 through 103

Mr. Lindemuth's second Motion to Dismiss contends that counts 1 through 103 fail to state crimes because the Indictment charges that he violated 18 U.S.C. § 152(1) and § 152(2) on the very day he purchased each of the 103 firearms at issue and the Indictment fails to identify any false oath or account. The government contends that Mr. Lindemuth's § 152(1) argument is a red herring and that he was never charged with violating § 152(2). At the April 3 hearing, the parties agreed that the Indictment did not charge Mr. Lindemuth with any offense under 18 U.S.C. § 152(2). It appears that Mr. Lindemuth, initially, misunderstood the Indictment as charging him under 18 U.S.C. § 152(2) when, in reality, it charged him with aiding and abetting under 18 U.S.C. § 2. His arguments under 18 U.S.C. § 152(2) thus are moot. With this misunderstanding rectified, the court turns to consider the parties' arguments under 18 U.S.C. § 152(1).

Mr. Lindemuth contends that counts 1 through 103 fail to state crimes for two reasons: (1) the Indictment alleges that he violated 18 U.S.C. § 152(1) on the day he purchased each firearm; and (2) the Indictment "fails to allege any act of concealment in violation of 18 U.S.C.

§152(1)" other than the act of purchasing each firearm (Doc. 48 at 5). The court addresses each argument, in turn, below.

### 1.    Date of Purchase

Mr. Lindemuth contends that he could not have violated 18 U.S.C. § 152(1) on the day he purchased a weapon because he had no duty under the Bankruptcy Code to report a purchase immediately. This theory rests on a dubious premise: That is, because Mr. Lindemuth was a debtor in possession, if he "conceal[ed] . . . any of the specific assets identified in Counts 1–103 . . . , [the concealment] could only have occurred upon the failure to disclose the asset in some statement made by Defendant in the bankruptcy proceedings, or on one of the[] monthly reports that was filed by his counsel." Doc. 48 at 4. He provides no authority to support this proposition, and the court's research located none. Instead, the court's research shows that his argument is wrong.

Even though it may be impractical to expect a debtor to report an asset the instant he acquires it, liability under § 152(1) attaches immediately—or so the sparse case law on the statute suggests. Section 152(1) does not require the government to prove the date that the concealment first began—it just requires the government to prove that a concealment occurred while a duty to disclose existed. *See* 18 U.S.C. § 152(1) (making it illegal to "knowingly and fraudulently" conceal "any property belonging to the estate of a debtor"); *see also Beery*, 678 F.2d at 867 (discussing § 152(1) as a crime that did not include time as an essential element). So, "the failure to disclose an asset may be charged as concealment under Section 152(1) on the day that the duty to report attaches." *United States v. Nunez*, 419 F. Supp. 2d 1258, 1269 (S.D.

Cal. 2005).  A debtor's duty to report and disclose assets attaches the day he files the bankruptcy

petition and continues throughout the pendency of the bankruptcy.[16]

Here, the Indictment alleges that Mr. Lindemuth concealed the firearms in counts 1

through 103 on different dates during the pendency of his bankruptcy proceedings.  The

Indictment thus alleges that Mr. Lindemuth concealed the firearms while he owed a duty to

disclose their existence, and therefore is legally sufficient under § 152(1).

To hold otherwise would contradict the premise of case law holding that separate charges

lie under § 152(1) for each asset or piece of property that is concealed after a debtor files the

bankruptcy petition.  *See supra* Part III.B.3.  If each post-petition asset or piece of property that

is concealed constitutes a separate offense, the debtor's liability for failing to report such assets

and property must attach when he acquires the asset or property.  Otherwise, cases like *Moser*

and *Moss* would hold that a debtor is liable under § 152(1) only once each month when the

debtor conceals assets from the bankruptcy court by submitting a false monthly report.  In other

words, *Moser* and *Moss* would hold that the unit of prosecution under § 152(1) is once monthly.

But, as the court discussed above, those cases hold that the unit of prosecution is each asset or

piece of property concealed.

Other good reason exists to support this conclusion.  In *Moss*, for instance, the Second

Circuit held that two counts based on "the execution of fraudulent affidavits of sale" for two

---

[16] *See Edwards*, 265 F.2d at 306 (explaining that a debtor's duty to disclose arises when the bankruptcy petition is filed); *see also* 4 Alan N. Resnick et al., *Collier on Bankruptcy* ¶ 521.07 (16th ed.), LexisNexis ("The duty to disclose assets is a continuing one.  If, during the case, the debtor or counsel for the debtor discovers assets or claims that have not been scheduled, the schedules should be amended." (footnote omitted)); *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1159 (10th Cir. 2007) ("The bankruptcy code imposes a duty upon a debtor to disclose all assets, including contingent and unliquidated claims."  (citing 11 U.S.C. § 521(1))); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001) ("The debtor's duty to disclose potential claims as assets does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding."  (first citing *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207–08 (5th Cir. 1999); then citing *Youngblood Grp. v. Lufkin Fed. Sav. & Loan Ass'n*, 932 F. Supp. 859, 867 (E.D. Tex. 1996); then citing Fed. R. Bankr. P. 1009(a))).

vehicles on the same day were not multiplicitous. 562 F.2d at 160. And, in *United States v. Cluck*, the Fifth Circuit held that two counts involving two separate deposits to a bank account during the same month were not multiplicitous. 143 F.3d at 177, 179. The court thus concludes that it is not improper for the Indictment to charge Mr. Lindemuth with concealing the firearms listed in counts 1 through 103 on the day he purchased them—his duty to disclose post-petition assets attached immediately, even if he was not expected to report them until the end of the month.

The court concludes that the Indictment is sufficient under § 152(1).

### 2.   *Intent to Conceal*

Mr. Lindemuth next contends that the Indictment fails to charge "specific intent to conceal any of the assets" in counts 1 through 103 because, "other than the act of purchasing the asset, the superseding indictment fails to allege any act of concealment in violation of 18 U.S.C. §152(1)." Doc. 48 at 5.

"In charging a concealment good pleading requires that at least some method be indicated in the count of the indictment [showing] the manner in which the concealment was accomplished." *United States v. Mathies*, 203 F. Supp. 797, 800 (W.D. Pa. 1962). But "the word 'concealment' may describe many things." *Id.* (quoting *United States v. Kramer*, Crim. Action Nos. 15509, 15510 (W.D. Pa. Sept. 16, 1958)). "[C]oncealment means more than 'secreting'; one does not have to put something in a hidden compartment, a safe, or a hole in the backyard in order to 'conceal' it. It is enough that one 'withholds knowledge,' or 'prevents disclosure or recognition.'" *United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir. 1984) (citation omitted); *Burchinal v. United States*, 342 F.2d 982, 985 (10th Cir. 1965); *see also United States v. Love*, 17 F. App'x 796, 800 n.5 (10th Cir. 2001) (discussing *United States v.*

*Turner* favorably); *Butler v. Butler (In re Butler)*, 377 B.R. 895, 918 (Bankr. D. Utah 2006) (defining *concealment* in a statute similar to 18 U.S.C. § 152(1) as not "confined to physical secretion" but also encompassing "placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusals to divulge owed information" (citation omitted)).

Courts have given concealment this broad meaning in the bankruptcy context because, in part, of the congressional intent supporting § 152. *See United States v. Wagner*, 382 F.3d 598, 608 (6th Cir. 2004) ("Several circuits have recognized that § 152 is 'a congressional attempt to cover *all* of the possible methods by which a debtor or any other person may attempt to defeat the intent and effect of the bankruptcy law through *any* type of effort to keep assets from being equitably distributed among creditors.'" (citations omitted)). As the Sixth Circuit has explained, "[s]ection 152 serves a broad purpose; it exists to prevent a wide array of behavior designed to stymie the bankruptcy system, and consequently it targets many different kinds of conduct." *Id.*

So, failing to disclose the existence of an asset that is part of the bankruptcy estate is sufficient to constitute concealment under § 152. *See United States v. McIntosh*, 124 F.3d 1330, 1136–37 (10th Cir. 1997) (explaining that the defendant became liable for concealment when he failed to disclose property); *Moser*, 453 F. App'x at 768 (finding evidence that the defendant "failed to disclose the return of all of the coins and stamps in his Chapter 13 pleadings" as sufficient to support concealment). Indeed, the Tenth Circuit has opined that even filing incomplete disclosures may "work[] to 'prevent disclosure' to the bankruptcy court and to the creditors" and thereby constitute concealment under § 152. *Love*, 17 F. App'x at 800 n.5.

Mr. Lindemuth contends that the Indictment here fails to allege any concealment—despite the term's broad meaning—for four main reasons. Two of his arguments fail for the same reason: they rely on evidence or information outside the Indictment. In one of these

48

arguments, Mr. Lindemuth contends that counts 1 through 103 fail to state a crime because, "[w]ith each firearm purchase[d], [he] disclosed the transaction to his bank, Envista, which was one of the creditors in the bankruptcy, and further, disclosed to the Federal Government his intent to purchase the firearm." Doc. 48 at 5. The Indictment does not allege that Mr. Lindemuth paid for the firearms listed in counts 1 through 103 with funds from the Envista account. And the Indictment does not allege that Mr. Lindemuth disclosed to Envista any of the purchases charged by counts 1 through 103, the government, or any of his creditors. Mr. Lindemuth's disclosure argument, then, relies on evidence outside the Indictment, and the court may not consider it here. *See Todd*, 446 F.3d at 1067; *see also United States v. McCumber*, No. 08-40061-JAR, 2009 WL 700618, at *2 (D. Kan. Mar. 17, 2009) (denying a defendant's motion to dismiss charges under 18 U.S.C. § 152(1) because the defendant's argument rested on evidence produced in discovery, and not on allegations set forth in the indictment).

In his second argument, Mr. Lindemuth contends that counts 1 through 103 fail to state a crime because the six financial statements mentioned in the Indictment were all filed on January 3, 2013, which was months before the firearms purchases charged in those counts. The Indictment never mentions the date when Mr. Lindemuth filed the financial statements. *See* Doc. 32 at 3. So Mr. Lindemuth must derive this date from evidence, not from the Indictment. The court thus may not consider his argument on a motion to dismiss.[17]

Mr. Lindemuth's two remaining arguments are premised on the same flawed reading of the Indictment. First, he contends that the Indictment alleges that he bought the firearms listed in counts 1 through 103 but that it does not allege any act of concealment. Second, he contends that

---

[17] Even if the Indictment had listed January 3, 2013, as the date of filing, Mr. Lindemuth's argument still would fail. As the court noted previously, "[t]he debtor's duty to disclose . . . assets does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding." *Hamilton*, 270 F.3d at 785 (citations omitted). The Indictment thus may state a crime despite the fact that Mr. Lindemuth may have filed some financial statements before he purchased the firearms discussed in counts 1 through 103.

the Indictment's theory is that he violated § 152(1) simply by possessing property purchased with funds from the bankruptcy estate. Neither of these arguments comports with the Indictment's allegations. The Indictment alleges that "[d]uring the pendency of the Lindemuth Bankruptcies, between August 1, 2013, and December 31, 2014, . . . [Mr. Lindemuth] purchased more than 100 firearms, valued at more than $80,000.00, without disclosing to the bankruptcy court, creditors and the United States Trustee, the firearms or the money used to purchase the firearms." *Id.* at 4. So, the Indictment does not allege that Mr. Lindemuth violated § 152(1) by simply possessing or purchasing the firearms at issue in counts 1 through 103. Instead, it charges that he violated that statute by failing to disclose the purchases of his property interests in the firearms. The Indictment thus alleges conduct that, if proven true under the reasonable doubt standard, could constitutes concealment under 18 U.S.C. § 152(1).

Accordingly, the court denies Mr. Lindemuth's Motion to Dismiss Counts 1–103.

## IV.    Conclusion

To recap, the court grants Mr. Lindemuth's Motion to Sever Counts 114 and 115, but denies his Motion to Dismiss Counts 1–103, 104, and 111 and his Motion to Dismiss Counts 1–103. The court also denies Mr. Lindemuth's Motion to Change Location of Trial, but does so without prejudice. Should circumstances arise that Mr. Lindemuth believes warrants filing a second motion to change venue, he may do so.

**IT IS THEREFORE ORDERED THAT** Kent Lindemuth's Motion to Change Location of Trial (Doc. 44) is denied without prejudice.

**IT IS FURTHER ORDERED THAT** Kent Lindemuth's Motion to Sever Counts 114 and 115 (Doc. 46) is granted.

**IT IS FURTHER ORDERED THAT** Kent Lindemuth's Motion to Dismiss Counts 1–103, 104, and 111 (Doc. 47) is denied.

**IT IS FURTHER ORDERED THAT** Kent Lindemuth's Motion to Dismiss Counts 1–103 (Doc. 48) is denied.

**IT IS SO ORDERED.**

**Dated this 14th day of June, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**